UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DEANNA J. MILLER, § § § § § § § § § § § § § | |
| Plaintiff, | |
| | CIV NO. 4:07-cv-2611 |
| v. | |
| MICHAEL J. ASTRUE, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## MEMORANDUM AND ORDER

Pending before the Court are Parties' Cross-Motions for Summary Judgment. The Court finds that Plaintiff's Motion, Doc. No. 12, should be **GRANTED**, and Defendants Motion, Doc. No. 10, should be **DENIED**.

**I.    BACKGROUND**

Plaintiff filed an application for Social Security disability benefits on September 16, 2003 alleging that she had been disabled since January 1992 by a back condition, breathing problems, dyslexia, spots on eye, hepatitis C, and mental illness (i.e., depression). (Tr. 535-537; 539.) After her application was denied initially and on reconsideration, an Administrative Law Judge (ALJ) held a hearing on October 22, 2005. Plaintiff was represented by an attorney at the hearing. Plaintiff, a vocational expert (VE), and two medical experts (ME) testified.

On January 26, 2006, the ALJ issued a decision finding that Plaintiff was not disabled. The ALJ found that Plaintiff had severe impairments of chronic obstructive pulmonary disease, hepatitis C, dysthymia, borderline intellectual functioning, and history of substance abuse (full remission). (Tr. 18.) The ALJ found that these impairments did not meet or medically equal one

1

of the listed impairments ("Listings") in 20 C.F.R. Part 404, Subpt. P, Appx. 1 (Tr. 21.) The ALJ concluded that Plaintiff's subjective complaints were not credible to the extent of total disability. (Tr. 21.) The ALJ then determined Plaintiff's residual functional capacity (RFC), finding that she could perform medium work compromised by occasional stooping and crouching, and the need to work in an environment free from poor ventilation, dust, fumes, gases, odors, humidity, wetness, and temperature extremes. (Tr. 21.) The ALJ found that Plaintiff could perform her past relevant work as a wire drawer. (Tr. 21.) On July 6, 2007, the Appeals Council denied review of the ALJ's decision in a written order on July 6, 2007. (Tr. 9-11.)

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.*

## III.   STANDARD OF REVIEW

Judicial review of an ALJ's denial of disability benefits is limited to determining "whether the decision is supported by substantial evidence in the record and whether the proper

2

legal standards were used in evaluating the evidence." *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). "It must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (internal quotation marks omitted) (citing *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973); *Payne v. Weinberger*, 480 F.2d 1006 (5th Cir. 1973)). Where "the Secretary has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial." *Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990) (internal citation omitted).

A disability claimant bears the initial burden of proving that she is disabled. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). A person claiming a disability must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore, "[a] claimant is eligible for benefits only if the onset of the qualifying medical impairment began on or before the date the claimant was last insured." *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

> The Court evaluates a disability claim via a five-step process, as follows:
>
> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment"; (3) a claimant whose impairment meets or is equivalent to an impairment listed in

3

      Appendix 1 of the regulations will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled"; and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

*Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (citing *Villa*, 895 F.2d at 1022). The claimant bears the burden of proof on the first four steps, and then the burden shifts to the Commissioner to establish the claimant is capable of performing work in the national economy. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

## IV.   LISTING 12.05—MENTAL RETARDATION

Plaintiff argues that the ALJ failed to apply the correct legal standard when determining that she did not meet the criteria of Listing 12.05(C). Plaintiff additionally asserts that the ALJ's Listing determination is not supported by substantial evidence.

### A.   Legal Standard

If a claimant meets a Listing, she will be found disabled regardless of her age, education, or work experience. 20 CFR § 404.1520(d); *see also Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) ("If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."). "To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." *Id.*; *see also* 20 C.F.R. §§ 404.1525(c)(3) (noting that an impairment must also meet "any relevant criteria in the introduction").

Listing 12.05 addresses mental retardation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05. Section 12.00A of the Appendix clarifies that "The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A. Specifically, "Listing 12.05 contains an introductory paragraph with the

diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." *Id.*

The introductory paragraph to Listing 12.05 states: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05. A claimant who satisfies the diagnostic description must also demonstrate that she meets the "required level of severity," which includes, under 12.05(C):

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*Id.* § 12.05(C)

To meet the criteria of Listing 12.05(C), therefore, a claimant must: 1) demonstrate significantly subaverage general intellectual functioning and deficits in adaptive functioning initially manifested during the development period, i.e. before age 22; 2) have a valid verbal, performance, or full scale IQ of 60 through 70; and 3) have a physical or other mental impairment imposing an additional and significant work-related limitation of function.

The parties seem to agree that Plaintiff's IQ scores—Verbal I.Q. 66, Full Scale I.Q. 69, Performance I.Q. 79 in November 2003, and Verbal IQ 70, Full Scale IQ 68, Performance IQ 72 in February 2000—demonstrate that she has significantly subaverage general intellectual functioning and fall within the range specified by Listing 12.05(C).[1] (Tr.195, 719-20.) Plaintiff

---

[1] The Court further acknowledges that several circuit and district courts that have adopted a presumption that a person's I.Q. remains stable over time in the absence of evidence of change in intellectual functioning, and do not require claimants to present evidence that their low I.Q. manifested before age 22. *See, e.g., Hodges v. Barnhart,* 276 F.3d 1265, 1269 (11th Cir. 2001) (finding that there is a presumption "that IQ's remain fairly constant

5

also has an "additional and significant work-related limitation of function," as required by 12.05(C). *See, e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00 ("[W]e will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)). The Parties disagree, however, about whether Plaintiff has the deficits in adaptive functioning required by the introductory paragraph's diagnostic description for mental retardation.

Listing 12.05 itself does not explicitly define "deficits in adaptive functioning." The Social Security Administration (SSA) has stated that the definition of mental retardation in the introductory paragraph of the Listing is "consistent with, if not identical to, the definitions of mental retardation used by the leading professional organizations." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (April 24, 2002). The SSA recognized that the four major professional organizations in the United States that deal with mental retardation have "each established their own definition of MR," and noted that "[w]hile all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below, age of onset and the method of measuring the required deficits in adaptive functioning differ among the organizations." *Id.* For example, the American Psychiatric Association requires significantly subaverage general intellectual functioning "that is accompanied by significant limitations in at least two of the following skill

---

throughout life"); *Muncy v. Apfel*, 247 F. 3d. 728, 734 (8th Cir. 2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning); *Muncy v. Apfel*, 247 F. 3d. 728, 734 (8th Cir. 2001) ("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning."); *Guzman v. Bowen*, 801 F.2d 273, 276-75 (7th Cir. 1986) (adopting presumption that low I.Q. existed prior to first I.Q. test); *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985) ("[T]here may be many reasons why an individual would not have had the opportunity or need to have a formal intelligence quotient test until later in life. The fact that one was not earlier taken does not preclude a finding of earlier retardation."); *Rowell v. Apfel*, 2000 WL 1449887, at *5 n.3 (E.D. La. 2000) (refusing to decide the question, but citing a series of district and circuit court opinions finding that a low I.Q. score raises the presumption of manifestation during the developmental period). The Court finds the reasoning in these cases persuasive.

areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years" *Id.* (citing DSM-IV and noting that the definition is predominantly based on the revised definition promulgated by the American Association on Mental Retardation). The DSM-IV's diagnostic criteria further clarifies that a diagnosis of mental retardation requires "[c]oncurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meting the standards expected for his or her age by his or her cultural group) . . . .") DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 45 (4th ed., Text Revision, 2000) ("DSM-IV"). The American Psychological Association's definition, on the other hand, requires "significant limitations in adaptive functioning, which exist concurrently" with an onset before the age of 22 years; the "criterion of significance is a summary index score that is two or more standard deviations below the mean." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 (citing MANUAL OF DIAGNOSIS AND PROFESSIONAL PRACTICE IN MENTAL RETARDATION (Am. Psych. Ass'n. 1996)). After reviewing these definitions, the SSA declined to adopt any one of the specific definitions, explaining:

> The definition of MR used by SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another. While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations.

*Id.*

Thus, the SSA definition does not appear to require a formal diagnosis of mental retardation, but the introductory paragraph can be met if the individual is found to have, *inter*

*alia*, deficits in adaptive functioning as defined by any of the four professional organizations. *See also Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) (finding that the Listing does not require a formal diagnosis of mental retardation).

Mental retardation can be distinguished from borderline intellectual functioning. Generally, a diagnosis of mental retardation requires an IQ score below 70, while borderline intellectual functioning includes individuals with an IQ ranging from 71 to 84. *See, e.g., Bouton v. Astrue*, No. 07-4039-JAR, 2008 WL 627469, at *6 (D. Kan. Mar. 4, 2008) (citing DSM-IV, 41-42, 48, 49). However, according to the DSM-IV definition of Mental Retardation, due to a potential measurement error of approximately 5 points:

> [I]t is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning. Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.

*Id.* As a result, although a formal diagnosis of mental retardation is not necessary to meet the requirements of Listing 12.05, some courts have found that an explicit diagnosis of borderline intellectual functioning can demonstrate that a claimant with IQ scores under 70 does not meet the Listing where the diagnosis is based on lack of deficits in adaptive functioning.[2] *See, e.g., Arce v. Barnhart*, 185 Fed. Appx. 437, 438 (5th Cir. 2006) (unpublished) (finding that a claimant did not meet Listing 12.05, where the claimant had a full scale IQ of 69, performance IQ of 66, and verbal IQ of 72, but a state medical determined that the claimant "did not have deficits in adaptive functioning."); *Cox v. Astrue*, 495 F.3d 614, 618-19 (8th Cir. 2007) (finding that a claimant did not meet Listing 12.05 where an examining doctor determined that the claimant's

---

[2] The SSA has clarified that "[W]here more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided, in the Weschler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(D)(6)(c).

adaptive functioning was "more consistent with 'borderline intellectual functioning' than mental retardation"); *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007) (unpublished) (upholding ALJ's finding that claimant did not meet Listing 12.05 where claimant had scores of verbal IQ of 67, performance IQ of 72, and full-scale IQ of 66, but psychological examiners found borderline intellectual functioning and claimant presented "absolutely no evidence that he experienced deficiencies at all in 'adaptive functioning,' let alone that any such deficiencies arose during the developmental period."); *Bouton v. Astrue*, No. 07-4039-JAR, 2008 WL 627469, at *6 (D. Kan. Mar. 4, 2008).[3]

    Plaintiff points out that at least one district court has held, however, that a plaintiff met the requirements of Listing 12.05(C) despite a doctor's finding that the plaintiff's intellectual functioning was more consistent with borderline intellectual functioning than mental retardation. *King v. Barnhart*, No.1:06-cv-0381-DFH-TAB, 2007 U.S. Dist. LEXIS 26052 (N.D. Ind. Feb. 26, 2007). In *King*, the plaintiff had a verbal IQ of 64, a performance IQ of 81, and a full scale IQ of 69. *Id.* at *7. A state examining doctor found that the plaintiff would be "incapable of managing his funds independently," but also observed: "his adaptive level of functioning given that he has a driver's license and has helped to run a bait store in the house where he is living along with his significantly elevated performance IQ, it would appear that his level of intellectual functioning is more consistent with borderline intellectual functioning." *Id.* at *8. The court

---

[3] It is not clear that the other cases cited by Defendant are directly on point. For example, in *Lewis v. Barnhart*, the district court upheld the ALJ's finding that the claimant did not meet Listing 12.05, but in that case the validity of the IQ scores were in question. 460 F. Supp. 2d 771, 783 (S.D. Tex. 2006) (noting that the IQ test used was "not expressly recognized by the Commissioner's regulations as a reliable method for determining IQ" and that the doctor conducting the test observed that the claimant did not give much effort during testing). Likewise, in *Domingue v. Barnhart*, the Fifth Circuit upheld an ALJ's finding that a claimant diagnosed with "borderline intellectual functioning" did not meet the Listing for mental retardation despite IQ scores that fell below 70 in a case involving allegations that the claimant's IQ scores were not accurate. 388 F.3d 462 (5th Cir. 2004); *see also* Brief for Apellee, 2004 WL 3140116, at *7-*10 (May 27, 2004). When Dr. Lehman assessed Plaintiff's IQ in February 2000, he noted that "due to depression, the claimant's scores could be a slight underestimate of her functional ability levels" (Tr. 18.) Nonetheless, Dr. Lehman assessed Plaintiff's IQ again in November 2003 and did not question the validity of those results. (Tr. 717-21.)

found, however, that the record demonstrated that the plaintiff clearly had deficits in adaptive functioning that manifested before the age of 22. He repeated both kindergarten and first grade, was in special education from fifth through twelfth grade, and had a "Global Assessment Functioning" or GAF score of 59, which describes "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at *9-10 (citing DSM-1V at 34.) Furthermore, the court noted that when plaintiff obtained a drivers' license, he had to have the test read to him because of his problems with reading, writing, and spelling, and that plaintiff still relied on friends for transportation. *Id.* at 14. The record also reflected that plaintiff was living in his friends' home and helped out at the bait shop by keeping bait stocked, but could not actually run the shop due to his difficulties with calculations and making change. *Id.* at 15. ("Helping out his friend at the bait shop was not remotely comparable to competitive employment."). The Court concluded that, when plaintiff "had been in better physical shape at a younger age, he had managed to hold a number of different jobs, almost always for brief periods, despite his intellectual limitations. But the combination of physical impairments with his intellectual limitations is sufficient to satisfy the severity criteria of Listing 12.05(C)." *Id.* at 15.

**2. Analysis**

In the present case, the ALJ appears to have relied largely on Dr. Mark Lehman's diagnosis of "borderline intellectual functioning" and the testimony of Medical Expert Dr. Glen Sternes when determining that Plaintiff did not meet the criteria of Listing 12.05(C). Dr. Lehman conducted IQ testing and assessed Plaintiff in February 2000 and in November 2003. Dr. Lehman found in February 2000 that Plaintiff's adaptive behaviors were "above the level of mild mental retardation," and, as a result, diagnosed borderline intellectual functioning instead of

mental retardation. (Tr. 196). Dr. Lehman evaluated Plaintiff again in November 2003 and reiterated his diagnosis of borderline intellectual functioning. At the hearing before the ALJ, Medical Expert Dr. Glen F. Sternes, testified, after review of the entire file, that Plaintiff did not meet or equal Listing 12.05.[4] (Tr. 922-24 (referencing Dr. Lehman's evaluation and conclusion.)

In his decision, the ALJ agreed with Dr. Sternes' testimony, concluding that "the claimant has no degree of restriction of activities of daily living; mild degree of difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. The evidence does not establish the presence of the "C" criteria."[5] (Tr. 19.) The ALJ additionally observed that: "[Plaintiff] reported that she is able to take care of personal hygiene, launder clothes, watch television, visit with friends and family, wash her dogs, buy groceries, travel by herself, crochet, attend church services, and drive an automobile." (Tr. 19.)

Plaintiff argues that, contrary to the ALJ's assessment, the record clearly demonstrates that she had deficits in adaptive functioning initially manifested in the development period.

Plaintiff was in special education classes as a child. (Tr. 80, 135, 922.) Her ninth grade transcript reflects a D- in Language, a D+ in Math, a C- in Science, a C in Social Studies, a B+ in

---

[4] Although the ALJ's decision does not address this evidence, two agency doctors conducted Psychiatric Review Technique evaluations, and both also determined that Plaintiff did not meet or equal a listing. (Tr. 207-15, 296-309.) Somewhat confusingly, however, both doctors checked a box that seems to indicate that Plaintiff *does* meet the introductory paragraph of Listing 12.05, but did not check the box for the severity criteria C, and instead indicated borderline intellectual functioning as "a medically determinable impairment . . . that does not precisely satisfy the diagnostic criteria above" or referenced borderline intellectual functioning by checking a box called "other." (Tr. 211, 300.)

[5] The ALJ probably was not referring to 12.05(C) in making this remark, but instead to the "C" section of other mental impairment listings which explicitly require consideration of these exact criteria and which were also raised by the claimant. The same criteria have been considered relevant to the question of adaptive functioning for purposes of Listing 12.05, however, because they overlap, to a certain degree, with the definition of adaptive functioning deficits found, for example, in the DMV-IV. *See, e.g., Arce*, 185 Fed. Appx. at 438-39; *Sattler v. Commissioner of Social Sec.*, No. 07-13952, 2008 WL 2115256, at *5 (E.D. Mich. May 19, 2008). Notably, the "C" severity criteria do not consider certain adaptive behaviors such as functional academic skills, which are considered adaptive functioning behaviors by the DSM-IV.

Art, and a B- in Speech.[6] (Tr. 136.) Plaintiff dropped out of school and married at the age of 15. (Tr. 135.) According to Plaintiff and her parents, she did not drop out of school in order to get married, but decided to get married and leave school because she was frustrated with her poor performance in school. (Tr. 135, 898.)

Plaintiff currently reports having "only one friend," though she has a good relationship with her parents and sisters. (Tr. 193, 718, 920.) She has been married four times, and divorced or separated three times.[7] (Tr. 193.) Dr. Lehman also noted that Plaintiff's "speech and language abilities were limited" and her "[m]emory functions were impaired for both recent and remote events. For example, Ms. Miller could not identify the current President of the United States." (Tr. 719.) Plaintiff was found on two occasions to read at a third or fourth grade level, spell at a second grade level, and do arithmetic at a fourth grade level. (Tr. 196, 720.) In February 2000, Dr. Lehman opined that Plaintiff could not manage a benefit check on her own due to her low level of arithmetic knowledge, but in November 2003, Dr. Lehman found that she could manage a benefit check on her own behalf. (Tr. 196, 721.) Except for her job as a wire drawer, which lasted for three years and may have been the result of a Texas Rehabilitation Commission training program, Plaintiff appears to have limited work experience, though the reasons for her unemployment are unclear.[8] (Tr. 886.)

The record does support the ALJ's finding that Plaintiff can drive, at least "short distances." (Tr. 718.) She can also "cook very simple meals." (Tr. 718.) She can dress herself, take a shower, do her own laundry, and do some household chores. (Tr. 913.) She buys her own groceries, crochets, and attends church. (Tr. 914, 919.) Although Plaintiff currently lives with

---

[6] Other school transcripts are not in the record.
[7] Plaintiff was married to her first husband for six years, but was widowed. (Tr. 193.)
[8] Plaintiff worked as a "wire measurer" from 1989 to 1992, sizing wires; she had a few jobs that lasted for a few months subsequent to that time, including a job at an alteration shop and a grocery store. (Tr. 540, 883-84, 888, 891.) The ALJ concluded that her poor work history "indicates a lack of motivation to work." (Tr. 20.)

her parents or sometimes with her former husband, she used to live on her own. (Tr. 913, 899 ("I lived on my own . . . and then paying bills and stuff like that and I managed all that. I don't know how I did it, but I did it.").) Although Plaintiff's two daughters no longer live with her, she previously cared for her children.[9] (Tr. 920)

There is, therefore, evidence in the record indicating that Plaintiff had at least some deficits in adaptive functioning that manifested prior to the age of 22 and evidence that she may not have demonstrated such deficits in other areas. For example, Plaintiff clearly has deficits in functional academic skills, and her three divorces and lack of friends could suggest at least some problems with social/interpersonal skills. Dr. Lehman also noted that her speech and language abilities were limited. On the other hand, the record reflects that Plaintiff has been able to care for her personal needs, has lived on her own, and has raised children. There is no clear indication, at least from the definitions of adaptive functioning deficits of which this Court is aware, that adequate functioning in some areas can make up for deficits in other areas. It is at least *possible* that Dr. Lehman, Dr. Sternes, and the ALJ did not consider Plaintiff's adaptive functioning deficits to be significant enough to satisfy the Listing definition of mental retardation. The American Psychiatric Association's definition of mental retardation, for example, requires "*significant* limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV at 39 (emphasis added). The SSA did not explicitly adopt the DSM-IV definition, however, and the Listing itself requires only "deficits in adaptive functioning," and does not use the word

---

[9] Although Dr. Thomas Masciangelo, one of Plaintiff's treating physicians, found that Plaintiff was disabled from work due to Chronic Back Pain and Depression, he did state that Plaintiff is able to "manage a home with children" and did not "require supervision and/or structured environment." (Tr. 206.) Plaintiff testified that her daughter does not currently live with her "'cause I couldn't afford her to live with me." (Tr. 920.)

"significant."[10] The difficulty in this case is determining what standard the ALJ *actually* used in assessing Plaintiff's deficits in adaptive functioning.

Dr. Lehman does not appear to have administered a particular test to assess Plaintiff's adaptive functioning,[11] and it is not clear which, if any, of the four professional organization standards he relied upon in assessing Plaintiff's adaptive functioning. Nor did Dr. Lehman specifically discuss any particular areas of adaptive functioning or weigh the degree of Plaintiff's deficits in these areas.

The ALJ relied not only on Dr. Lehman's assessment, but also on Dr. Sternes' testimony. Dr. Sternes, in turn, appeared to rely largely on Dr. Lehman's diagnosis. Neither Dr. Sternes nor the ALJ explained what standard he was using to evaluate Plaintiff's level of adaptive functioning or discussed the extent of specific deficits. Although the ALJ stated that he found Plaintiff to have no restrictions of activities of daily living, a mild degree of difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation, those remarks seemed related to his analysis of the "C" severity criteria of the other psychiatric listings, and it is not clear that analysis of these criteria alone may substitute for analysis of the deficits in adaptive functioning required by Listing 12.05. (Tr. 19.) The ALJ did not discuss any other evidence in the record related to Plaintiff's adaptive functioning.

---

[10] The SSA did clarify that use of any of the four professional organization's measurement methods would be permitted. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, at 20022 ("SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations."). It is not absolutely clear, however, whether this means that use of one of the four definitions is required.

[11] There are several adaptive behavioral instruments that can be used to assess an individual's adaptive functioning. *See, e.g.*, MENTAL RETARDATION: DETERMINING ELIGIBILITY FOR SOCIAL SECURITY BENEFITS 166 (Board on Behavioral, Cognitive, and Sensory Sciences and Education 2002) (noting that "[t]here are at least 200 published adaptive behavior instruments" and that three are in wide use for diagnosis, and adding that "[a]lthough each scale described has both strengths and weaknesses, each has impressive psychometric characteristics and is highly recommended for use in eligibility determination and diagnosis.")

14

In reviewing a decision by an ALJ, this Court may not re-weigh the evidence or substitute its judgment for that of the ALJ. *See, e.g., Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). The Court must ensure, however, that the "proper legal standards were used in evaluating the evidence." *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Neither Dr. Lehman, the ALJ, nor this Court may improvise its own definition or standard for "deficits in adaptive functioning." *Barnes v. Barnhart*, No. 02-5153, 2004 WL 2681465, at *8 (10th Cir. Nov. 26, 2004) (unpublished) (criticizing the ALJ for "essentially improvis[ing] his own definition for 'deficits in adaptive functioning'"). Nor may the ALJ find that a claimant failed to meet the Listing just because she did not have a formal diagnosis of mental retardation. *See, e.g., Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006). Furthermore, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated . . . ."). As a general principle of administrative law, "[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." *SEC v. Chenery*, 332 U.S. 194, 196-97 (1947)

Dr. Lehman's, Dr. Sternes', and the ALJ's failure to discuss what standard they used to evaluate Plaintiff's deficits in adaptive functioning makes it difficult for this Court to determine whether the ALJ's decision is supported by substantial evidence. Indeed, at least one Circuit has remanded a case involving Listing 12.05, instructing the ALJ to choose a standard from one of the four professional organizations when evaluating whether a claimant had deficits in adaptive functioning. *Barnes*, 2004 WL 2681465, at *8 (noting that the record "clearly shows that

15

claimant has limitations in some of the areas the [American Psychiatric Association] considers relevant, but whether they are 'significant' under the APA's standard (or meet the requirements of whichever standard the ALJ might decide to use) is unknown."). While the SSA endorsed the use of any of the four professional organizations' standards, it did not explicitly adopt any one of those standards, and is not entirely clear whether the SSA meant to limit the ALJ to the use of those standards alone. What is clear, however, is that some standard must be used in order for judicial review to be possible.

The record reflects that Plaintiff had at least some deficits in adaptive functioning and that she otherwise met the criteria of Listing 12.05(C).[12] The ALJ's decision thus appears not to be supported by substantial evidence. Furthermore, the ALJ's failure to articulate any standard by which he evaluated Plaintiff's deficits in adaptive functioning and his reliance on findings that likewise fail to clarify such a standard suggest that the ALJ may have used improper legal standards in evaluating the evidence. In order for the Court to evaluate properly the ALJ's finding, however, it must know what standard the ALJ used to evaluate Plaintiff's deficits in adaptive functioning. The Court will therefore remand this case to the ALJ for reconsideration of Plaintiff's Listing argument. On remand, the ALJ should clarify what standard is being applied to evaluate Plaintiff's deficits in adaptive functioning and should analyze further the evidence in the record in a manner not inconsistent with this Order. If further evidence is needed to make the Listing determination, either Plaintiff or the ALJ will be free to supplement the record on remand.

## V.   CONCLUSION

---

[12] The Court notes, however, that the ALJ did not reach the question of the 12.05(C) severity criteria.

Plaintiff's Motion, Doc. No. 12, is hereby **GRANTED** and Defendant's Motion, Doc. No. 10, is **DENIED**. This case is **REMANDED** to the ALJ for further proceedings not inconsistent with this Order.

**IT IS SO ORDERED.**

**SIGNED** this _8th_ day of September, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE